**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-1234**

JOSEPH LAROSA; DOMINICK LAROSA,

Plaintiffs - Appellants,

v.

VIRGIL D. LAROSA; SANDRA LAROSA,

Defendants – Appellees,

and

ANDREA PECORA, a/k/a Andrea Fucillo; JENNIFER LAROSA WARD; CHRIS WARD; CHEYENNE SALES COMPANY, INCORPORATED,

Defendants,

JOAN LAROSA, individually and as the Executrix of the Estate of Virgil B. LaRosa,

Party-in-Interest.

**No. 11-1306**

JOSEPH LAROSA; DOMINICK LAROSA,

Plaintiffs - Appellees,

v.

VIRGIL D. LAROSA; SANDRA LAROSA,

Defendants – Appellants,

and

CHEYENNE SALES COMPANY, INCORPORATED; ANDREA PECORA, a/k/a Andrea Fucillo; JENNIFER LAROSA WARD; CHRIS WARD,

Defendants,

JOAN LAROSA, individually and as the Executrix of the Estate of Virgil B. LaRosa,

Party-in-Interest.

_____

Appeals from the United States District Court for the Northern District of West Virginia, at Clarksburg. Frederick P. Stamp, Jr., Senior District Judge. (1:07-cv-00078-FPS-JSK)

_____

Argued: March 21, 2012                    Decided: April 30, 2012

_____

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

_____

Reversed, vacated, and remanded by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Floyd joined. Judge Niemeyer wrote a dissenting opinion.

_____

**ARGUED:** David Bruce Salzman, CAMPBELL & LEVINE, LLC, Pittsburgh, Pennsylvania, for Joseph LaRosa and Dominick LaRosa. James Strother Crockett, Jr., SPILMAN, THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Virgil D. LaRosa and Sandra LaRosa. **ON BRIEF:** Mark S. Frank, Frederick D. Rapone, Jr., Erik Sobkiewicz, CAMPBELL & LEVINE, LLC, Pittsburgh, Pennsylvania, for Joseph LaRosa and Dominick LaRosa. Matthew P. Heiskell, SPILMAN, THOMAS & BATTLE, PLLC, Morgantown, West Virginia, for Virgil D. LaRosa and Sandra LaRosa.

_____

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

On appeal and cross-appeal from the district court's judgment, we address two issues. First, whether the plaintiffs' West Virginia Uniform Fraudulent Transfer Act ("WVUFTA") claim based on a corporation's drawdown on its line of credit and purchase of annuities was time-barred. Second, whether the district court's denial of the plaintiffs' Rule 59(e) motion to increase the damage award was an abuse of discretion. As to the first issue, we reverse the district court's determination that the WVUFTA claim was not time-barred. Regarding the second issue, we vacate the district court's denial of the plaintiffs' Rule 59(e) motion, and we remand this case to the district court for further proceedings consistent with this opinion.

I.

This case has an extensive history. Because in an unpublished opinion we write for only the parties, we set forth the facts only as necessary to treat the issues in this appeal.

Brothers Joseph LaRosa and Dominick LaRosa (the "Creditors"), made a loan in 1982 to their cousin Virgil B. LaRosa and his wife Joan LaRosa (the "Debtors") for $800,000. Debtor Virgil B. was the sole shareholder of defendant Cheyenne Sales Company, Incorporated ("Cheyenne") until his death in 2006, at which time Debtor Joan LaRosa became the sole owner of

3

Cheyenne, which is not a party here. The Debtors never made a payment on the loan, and on November 3, 1994, the Creditors obtained a judgment against them for $2,844,612.87 plus $10,000 in attorneys' fees.

On November 19, 2003, the Debtors filed for a Chapter 11 bankruptcy. Three reorganization plans filed by the Debtors in their bankruptcy proceedings proposed that Cheyenne's operations would allow the Debtors' estate to make payments of $7,000 per month for 60 months to repay the Debtors' obligation to the Creditors. As far as this Court is aware, none of the plans were confirmed, and the bankruptcy case was converted to a Chapter 7 bankruptcy.

After a series of disputes about the finality of the Creditors' judgment against the Debtors, settled by this Court's per curiam opinion LaRosa v. LaRosa, 108 F. App'x 113 (4th Cir. 2004), the Creditors tried to collect on the judgment by indexing it in counties in West Virginia where the Debtors owned real property.

Around that time, however, the Debtors initiated a series of transactions that fraudulently put their assets beyond the reach of the Creditors. Debtors used Cheyenne to funnel some of their assets toward Virgil D. LaRosa and Sandra LaRosa (the "Transferees"). Transferee Virgil D. is the son of the Debtors and the sole shareholder of Regal Coal Company, Inc.

4

("Regal"), though the company is not a party to this litigation because the claims against it have been severed due to a bankruptcy stay.

The Creditors sued the Transferees in the Northern District of West Virginia on June 12, 2007, to recover the alleged fraudulently transferred assets. After extensive discovery, a bench trial occurred in mid-2009. The parties filed proposed findings of law and fact and written closing arguments. At that time, the Creditors settled with the non-party defendants, and the parties filed supplemental proposed findings of fact and law.

On September 15, 2010, the district court issued its memorandum opinion, finding that the Transferees engaged in a series of intentionally fraudulent transfers designed to hinder, delay, and defraud the Creditors' efforts to collect on their judgment against the Debtors -- violations of the WVUFTA. The district court found that "Cheyenne [was] operated as a conduit through which a portion of debtor's wealth is passed on its way to defendants or others." J.A. 3669. There were three types of transfers alleged to be violations of the WVUFTA, and the district court found all three types were indeed violations. The court ordered judgment against the Transferees for $1,191,609 but attached the Transferees' property worth

$6,799,161.42. The amount of the attachment was the amount owed to the Creditors by the Debtors after including interest.

The judgment in the amount of $1,191,609 is based on two categories of transfers. The first of these is based on a $491,609 transfer from Virgil B. LaRosa to Cheyenne, which eventually found its way to the Transferees. Virgil B. LaRosa's transfer occurred a few weeks after the Creditors began to execute judgment against the Debtors. This transfer is not disputed on appeal. The second transfer was Cheyenne's purchase of annuities, the accounts of which were used for the benefit of Virgil D. LaRosa and Regal, using $700,000 obtained from Cheyenne's line of credit that encumbered Debtors' securities. These transfers total the judgment awarded: $1,191,609.

The district court also found that the third category of transfers -- a series of business dealings between Cheyenne and Regal -- likewise constituted violations of the WVUFTA. The district court did not award an increased judgment consistent with that finding. This failure to assign a value to the Cheyenne-Regal transfers forms the basis of the Creditors' appeal.

Both parties filed Rule 59(e) motions. The Creditors requested a judgment worth $6,799,161.42, and the Transferees requested a reduction of the attachment to the amount of the judgment -- $1,191,609. The court agreed with the Transferees

6

and reduced the amount of the attachment accordingly. The instant appeal and cross-appeal followed.

II.

The Transferees' contention on cross-appeal is that there can be no liability stemming from Cheyenne's annuities purchase based on Cheyenne's $700,000 drawdown of its credit line. They argue that because Virgil B. LaRosa's pledge of securities that served as guaranty of the line of credit occurred more than four years before the Creditors filed the instant action, the claim is time-barred by the WVUFTA. We review de novo the construction and application of the statute of repose. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Because the language and history of the statute of repose make clear that it runs from the date of the security pledge, we reverse the district court and hold that the Creditors' WVUFTA claim on the line of credit was time-barred.

On January 25, 2001, Cheyenne entered into a Loan Agreement with Huntington National Bank (the "Bank"), that permitted Cheyenne to borrow up to $950,000 on a line of credit. Debtor Virgil B. LaRosa pledged a series of securities to secure the line of credit. On June 26, 2003, Transferee Virgil D. LaRosa drew down $700,000 under Cheyenne's line of credit with

7

the Bank. With this money Cheyenne purchased over a million dollars in annuities, which were owned and controlled by Cheyenne but whose accounts were used to transfer money to Virgil D. LaRosa and Regal. The transfers were made according to a sham land renewal lease. The district court found the scheme to be fraudulent under the WVUFTA and awarded the Creditors $700,000 on this claim.

The Transferees argue that the statute of repose had passed on this transaction. Crucial to the argument is the interpretation of W. VA. CODE § 40-1A-6(d), which provides:

> A transfer is not made until the debtor has acquired rights in the asset transferred and an obligation is incurred. If the obligation is oral, a transfer is made when the obligation becomes effective. If the obligation is evidenced by a writing, the obligation becomes effective when the writing is delivered to or for the benefit of the obligee.

The Transferees argue that while the drawdown occurred in 2003, the written security agreements that established the collateral pledge were delivered to the Bank on January 30, 2001. The WVUFTA's statute of repose should therefore run from the January 30, 2001 date. Because the Creditors filed their action in 2007, the Transferees argue, the statute of repose period had passed. See W. VA. CODE § 40-1A-9(a), (b) (establishing a four-year statute of limitations period for violations of W. VA. CODE §§ 40-1A-4(a)(1)-(2), 40-1A-5). Creditors respond that the statute of repose did not begin until

8

the securities were actually encumbered by a drawdown on the credit line, which occurred at the time of the $700,000 drawdown in 2003.

We agree with the the Transferees. According to the WVUFTA, the securities were encumbered at the time they were pledged as collateral for the line of credit because the written credit-facility agreement created a security interest held by the Bank on the pledged securities. See W. VA. CODE § 40-1A-6(a)(1) (defining a "transfer" as occurring for real property "when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee"); W. VA. CODE § 40-1A-6(a)(2) (defining a "transfer" as occurring for other assets "when the transfer is so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under this article that is superior to the interest of the transferee").

As the West Virginia Code states, "A transfer is not made until the debtor has acquired rights in the asset transferred and an obligation is incurred." W. VA. CODE § 40-1A-6(d). Cheyenne's obligation is contained in the promissory note. At the time the note was created, Cheyenne incurred the obligation to pay back, at whatever time the Bank should demand

9

it, the full value of the Note outstanding at the time of the demand, and in return, Cheyenne received the benefit of being able to obtain advances on the $950,000 at will. The line of credit extended to Cheyenne was a revolving credit line; under the terms of the promissory note, Cheyenne could request advances without further due diligence by the Bank. J.A. 2270 (promissory note). "If the obligation is evidenced by a writing" -- here, the writing is the promissory note -- "the obligation becomes effective when the writing is delivered to or for the benefit of the obligee," and the note was delivered in 2001. W. VA. CODE § 40-1A-6(d). No other party could "on a simple contract . . . acquire a judicial lien . . . that is superior to the interest of the transferee." W. VA. CODE § 40-1A-6(a)(2). The security interests held by the Bank were perfected and attached at the time the credit-facility agreement was signed because value had been given by the Bank: the Bank was now required to make advances at the request of the Debtors on the full $950,000 value of the note. See W. VA. CODE § 46-9-203(a)(1) (stating that attachment of the security interest occurs when "value has been given" by the security holder). Furthermore, the West Virginia codification of the Uniform Commercial Code ("WVUCC") specifically provides that a person gives "value" for rights when he acquires the rights "[i]n return for a binding commitment to extend credit or for the

10

extension of immediately available credit, whether or not drawn upon." W. Va. Code § 46-1-204(1). The note and security pledges are indisputably transfers under the WVUFTA.

Because the original commitment made by the Bank to Cheyenne contained in the promissory note constitutes the transfer of the full value -- Cheyenne thereafter had a right under the agreement to $950,000 -- the subsequent advances are not transfers within the meaning of the WVUCC and the WVUFTA. Furthermore, because "asset" does not include "[p]roperty to the extent it is encumbered by a valid lien," W. Va. Code § 40-1A-1(b)(1), the text of the WVUFTA does not support the argument that the transfer is the movement of value from the encumbered security to Cheyenne upon each advance. Thus, the assets were transferred for purposes of the WVUFTA only on January 30, 2001, the date the credit agreement was signed and the security interests were perfected and attached; the advances themselves did not constitute transfers under the WVUFTA. See Steven L. Schwarcz, The Impact of Fraudulent Conveyance Law on Future Advances Supported by Upstream Guaranties and Security Interests, 9 Cardozo L. Rev. 729, 740 (1987) (arguing that a future advance made pursuant to a committed loan agreement does not constitute a transfer of value under the Uniform Fraudulent Transfer Act, the Uniform Commercial Code, or the federal

11

bankruptcy code's fraudulent transfer prohibition, 11 U.S.C. § 548).

The conclusion that the credit agreement constituted the only transfer with respect to the credit line for WVUFTA purposes is bolstered by the comments to the Uniform Fraudulent Transfer Act's ("UFTA") 1984 amendments. Prior to 1984, the UFTA's predecessor statute said, "A transfer is not made until the debtor has acquired rights in the asset transferred and an obligation is incurred." The statute was amended in 1984 to add § 6(5), which says, "If the obligation is oral, a transfer is made when the obligation becomes effective. If the obligation is evidenced by a writing, the obligation becomes effective when the writing is delivered to or for the benefit of the obligee." Uniform Fraudulent Transfer Act § 6(5) (1985). The current West Virginia Code includes the 1984 amendments. W. VA. CODE § 40-1A-6(d) (2010).

Reading the comments to the UFTA, one learns that § 6(5) was added to "resolve the uncertainty arising from Rubin v. Manufacturers Hanover Trust Co., 661 F.2d 979, 989-91 (2d Cir. 1981), insofar as that case holds that an obligation of guaranty may be deemed to be incurred when advances covered by the guaranty are made rather than when the guaranty first became effective between the parties." Uniform Fraudulent Transfer Act § 6, cmt. 3 (1985). The amendment drafters likely considered

12

the significant costs that inure to loan creditors who, under the Rubin model, would be responsible for doing due diligence or seeking professional opinions every time a drawdown on a revolving credit facility occurred, which is precisely the sort of extra diligence that revolving facilities are meant to bypass.  The UFTA makes "the relevant time for testing the transfer . . . the outset of the transaction when the writings are delivered," and thereby "assure[s] that with respect to guarantors, a separate fraudulent conveyance analysis will not be made each time an advance is made to the principal debtor -- which could be over a period of months or years -- but only at the time the guaranty is signed."  1-3 COLLIER LENDING INSTITUTIONS & THE BANKRUPTCY CODE ¶ 3.06 (2011).  See Schwarcz, supra, at 740 (noting that Rubin would essentially force banks to "obtain, as a condition to making each future advance, the same representations and warranties as to the subsidiary's financial condition . . . as was obtained at the time the loan facility was originally extended. . . .  A lender could gain additional comfort by performing the same level of due diligence regarding these financial tests as was made originally").[1]  These opinions

---

[1]  There is a strong argument that Rubin itself does not stand for the principle that drawdowns on credit facilities always create new obligations.  The credit facility in Rubin did not allow for advances at the sole insistence of the borrower; the creditor decided each time an advance was requested whether
(Continued)

and investigations cost lenders money and therefore increase the cost of credit by an amount incommensurate with the benefit of protecting potential defrauded plaintiffs -- that was the judgment of the drafters of the UFTA amendment. The four-year repose period is best understood as balancing the potential injuries to banks and defrauded creditors. Within four years of the establishment of the credit line, banks bear the burden of fraudulent conveyance; the guaranty to the bank could be set aside if made with fraudulent intent or for less than equivalent value. Afterwards, plaintiffs bear the risk. Of course, even in the latter case, there is no windfall for the debtor because the bank still has its security interest in the debtor's property.[2]

We reverse the judgment of the district court on this issue and hold that because the Creditors did not file their claim within four years of the establishment of the line of

_____

to extend the advance, and therefore the creditor had the ability to analyze the risk that the borrower was skirting legal obligations to pay. See Schwarcz, supra, at 733-36.

[2] This admittedly becomes more complicated in the case of preferential payment of creditors' claims in which the debtor receives an indirect benefit when some claims are paid before others.

14

credit, their claim was barred by the WVUFTA's statute of repose.[3]

# III.

The Creditors argued below that the Debtors and Transferees instituted a scheme that channeled assets from Cheyenne to Regal through a series of transfers for which Cheyenne received little value from Regal in exchange for assets of significant value. The district court found that the transfers violated the WVUFTA but did not assign a value to the transfers fraudulently made and did not award the Creditors a remedy on this issue. The parties filed cross Rule 59(e) motions, and the court granted the Transferees' motion to lower

---

[3] Although not raised by the parties, we decline to affirm on the alternative grounds -- that the transfer occurred when Cheyenne purchased the annuities -- because to do so would violate the purpose of statutes of repose: to provide a strict maximum time limit for causes of action. Certainly, we may collapse "a series of transactions and treat[] them as a single integrated transaction." In re Sunbeam Corp., 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002). But we do not think it appropriate in this case to use the collapse doctrine to count the dates of the withdrawals from the annuity accounts, or some other Cheyenne-Transferee transfer date, as the start of the statute of repose for the challenged series of transactions. See Mills v. Everest Reinsurance Co., 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006) (rejecting the use of the collapse doctrine for statute of limitations purposes in the fraudulent conveyance context). Quite simply, Cheyenne is not a debtor to the Creditors; even a fraudulent transfer by Cheyenne to another party would not start the clock under the WVUFTA. The clock must start with a transfer from the covered parties, the Debtors.

15

the amount of the attachment and denied the Creditors' motion to increase the amount of the judgment. The Creditors appeal the denial of the Rule 59(e) motion. We review for abuse of discretion. Collison v. International Chem. Workers Union, 34 F.3d 233, 236 (4th Cir. 1994).

We vacate and remand the district court's denial of the Rule 59(e) motion for two reasons. First, we hold that it was an abuse of discretion for the district court to find the transfers violated the WVUFTA but refuse to assign an award to the Creditors in the amount fraudulently transferred. We remand so that the district court may engage in further fact-finding to determine the amount of the award owed to the Creditors. Second, assuming the district court maintains its finding that the Cheyenne-Regal transfers violated the WVUFTA, we remand in order for the district court to make specific findings as to which property of the Debtors was transferred that brought the Cheyenne-Regal transactions within the reach of the WVUFTA.

Rule 59(e) is used, as relevant here, to correct a clear error of law or prevent manifest injustice. Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998). The judgment awarded by the court totaled $1,191,609, "which is based upon the aggregate value of the cash infusion of $461,609.00 and the draw down of $700,000.00." J.A. 3681. The court did not include a figure for the Cheyenne-Regal transfers

despite having found that the transfers violated the WVUFTA. This discrepancy was raised by the Creditors in their Rule 59(e) motion, but the court did not give a clear statement as to why it did not award damages for this claim. The court apparently was under the impression that it did not need to resolve the dispute between the parties' experts as to the value of fraudulently transferred assets between Cheyenne and Regal.[4] See J.A. 3649 ("For the purposes of a complete ruling in this civil action, this Court does not believe that it is necessary to resolve this disputed testimony.").

We agree with the Creditors. Given that the district court found a violation of the WVUFTA, that the amount of the outstanding judgment against the Debtors is greater than the amount awarded to the Creditors in the decision below, and that the Creditors asked for damages against the Transferees in the amount of the judgment against the Debtors, the district court needed to resolve the factual discrepancy as to the value of the

[4] It is possible that the district court believed that it need not reach the issue because it thought it gave the Creditors everything that they had asked for when it awarded a judgment of $1,191,609.00. Although the Creditors admittedly omitted the larger amount in its supplemental findings of fact and law, they sought the larger amount in their initial findings of fact and law. It is clear that they recognized that the district court could rule against them on some of the issues and award a lesser amount, so they asked for alternative judgments. The Creditors' poor draftsmanship should not prevent the factual resolution needed to determine the amount of the award to which they are entitled in accordance with the law.

17

fraudulently transferred assets between Cheyenne and Regal. It was an abuse of discretion for the district court to not give a reason why it chose one damages award over another. To simply state that the Creditors asked for this award does not suffice given that the Creditors also requested a larger amount in their proposed findings. It would be a "manifest injustice" to allow the ruling to stand given the district court's findings that the Cheyenne-Regal transactions violated the WVUFTA and the lack of a corresponding remedy.

We also remand so that the district court can make specific findings as to what asset of the Debtors was transferred in conjunction with the Cheyenne-Regal transfers. The district court said that it "has examined the transactions between Cheyenne and Regal and regards these transactions as a transfer of assets away from the debtors. Cheyenne was operated to avoid the accrual or distributions of substantial profits and other entitlements which could have been made available to [the Debtors]." The court went on to say

> The transactions between Cheyenne and Regal, whether or not 'collapsed,' must be viewed as a transfer of wealth away from the debtors because Cheyenne was operated so as to avoid the accrual or distributions of substantial profits and other opportunities or entitlements to [the Debtors]. Debtors either directed or permitted their son, Virgil D. LaRosa, to operate their business and that of Regal, their son's corporation, as essentially a single business enterprise to transfer business opportunities and profits from Cheyenne to Regal in such a way as to

18

> hinder, delay and defraud the [judgment-creditors]. . . . Debtors did not receive reasonable equivalent value in exchange for these profits and business opportunities from Cheyenne through Regal to Virgil David LaRosa and Sandra LaRosa.

J.A. 3678-69.

While the court certainly made findings with respect to the treatment of Cheyenne and Regal as a single entity, the court did not make a factual finding as to what was transferred away from the Debtors -- a necessary precondition of the WVUFTA. In other words, the WVUFTA does not prohibit the fraudulent transfer of assets from Cheyenne to Regal; it prohibits fraudulent transfers from the Debtors to others. See W. VA. CODE § 40-1A-1(b) ("'Asset' means property of a debtor."); W. VA. CODE § 40-1A-1(b) ("'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance."). And while the collapse doctrine can be used to show that seemingly innocuous transfers from a sole shareholder to his corporation were in fact part of a nefarious scheme that defrauded the shareholder's creditors, there must nevertheless be a transfer from the shareholder to the corporation of some asset.

The district court said that the Debtors "either directed or permitted their son, Virgil D. LaRosa, to operate

19

their business and that of Regal, their son's corporation, as essentially a single business enterprise to transfer business opportunities and profits from Cheyenne to Regal in such a way as to hinder, delay, and defraud the debtors' creditors." J.A. 3678-79. So far the district court has not specified what asset of the Debtors was transferred that would enable the instant Creditors to have a cause of action under West Virginia law. In order to perform our function as an appellate court, we need to know what we are reviewing. On remand, the district court should make explicit what were the specific assets transferred away from the Debtors in violation of the WVUFTA.

We vacate and remand the district court's denial of the Creditors' Rule 59(e) motion for reconsideration of the motion consistent with this opinion. Assuming that the district court maintains its view that the Cheyenne–Regal transactions violated the WVUFTA, the court will have to resolve the significant factual dispute surrounding the amount fraudulently transferred through these transactions and specificy what asset of the Debtors was transferred in connection with the Cheyenne-Regal transactions that brought them within the purview of the WVUFTA. If the district court alters its judgment, it will likely, of course, need to alter the amount of the attachment.

IV.

We reverse the district court on the statute of repose issue, vacate the court's denial of the Creditors' Rule 59(e) motion, and remand this case to the district court for further proceedings consistent with this opinion.

<u>REVERSED, VACATED, AND REMANDED</u>

NIEMEYER, Circuit Judge, dissenting:

I

In addressing West Virginia's statute of repose, W.V. Code § 40-1A-9, the majority has, I respectfully suggest, focused on the wrong transaction and thus has applied the statute of repose in a manner that could bar causes of action for fraudulent transfers under West Virginia's Uniform Fraudulent Transfers Act even before the fraudulent transfers had been made.

While it is true that Virgil B. LaRosa created a line of credit for Cheyenne Sales Company with its bank in 2001, pledging his stock to secure the line, the line of credit was like a bank account on which Cheyenne could in the future draw as needed. There is no suggestion in the record, or by counsel, that in creating this line of credit, LaRosa acted with any fraudulent intent or purpose. The line of credit was simply a standing source of funds on which Cheyenne could thereafter draw for any purpose, legitimate or illegitimate.

The fraudulent transfer at issue in this case took place in 2003 when LaRosa ordered the bank to pay Cheyenne $700,000 from its line of credit for the purpose of avoiding creditors' efforts to seize his pledged stock. The effect of this payment to Cheyenne was a sale of the stock for $700,000 to

22

place it beyond the reach of creditors.  And it was this 2003 transaction that the district court found was fraudulent, in violation of West Virginia's Uniform Fraudulent Transfers Act, W. Va. Code § 40-1A-4(a), not the 2001 transaction that created the line of credit.

To find now that the limitations period for bringing a suit on the 2003 fraudulent transfer began <u>before the cause of action accrued</u> results in an absurdity, which we should not impute to the West Virginia legislature.  More importantly, the language of the limitation provision does not support this construction.  The statute provides in relevant part:

> A cause of action <u>with respect to a fraudulent transfer</u> . . . under this article is extinguished unless action is brought . . . [u]nder [§ 40-1A-4(a)] . . . within four years after <u>the transfer</u> was made.

W.V. Code § 40-1A-9(b) (emphasis added).  By employing the definite article, the last clause, "within four years after <u>the transfer</u> was made," refers back to the opening clause -- "[a] cause of action with respect to <u>a fraudulent transfer</u>."  West Virginia's statute, therefore, does not extinguish fraudulent transfer suits by reference to related, but <u>nonfraudulent</u>, transfers.  Instead, like any sensible statute of repose, the provision only bars causes of action for fraudulent transfers that have accrued.  Because the fraudulent transfer in this case took place in 2003, as the district court found, the subsequent

23

suit, filed within four years of that transfer to obtain relief from it, was therefore timely filed.

I respectfully conclude that the district court analyzed the statute of repose correctly and would therefore affirm its ruling on this issue.

II

In calculating the amount of relief, the majority has again focused, I respectfully submit, on the wrong transactions -- those between Cheyenne and a related corporation, Regal Coal Company, and between Regal and its principals. In doing so, the majority has lost sight of the fact that the only transactions that could be addressed for purposes of relief are those by which assets were transferred from Virgil B. LaRosa to others. See W.V. Code § 40-1A-1(b) (limiting the definition of "[a]sset[s]" covered by the statute to "property of a debtor") (emphasis added). LaRosa was the judgment debtor (along with his wife, Joan), and only transfers from him could be considered fraudulent with respect to the judgment creditors.

To be sure, the subsequent transfers from Cheyenne to Regal and from Regal to its principals are necessary links in the story, connecting the judgment debtor's initial transfer to Cheyenne with the eventual receipt of assets by Regal's principals. But no evaluation of those transactions would be

24

relevant to the amount of relief that could be granted, as the amount of relief would be limited by the amount of the transfers from LaRosa as the judgment debtor to others, which, as the district court found, was $1,191,609. Accordingly, I also conclude that the district court analyzed this issue correctly and therefore would affirm its judgment.

In short, I would affirm entirely the judgment of the district court.