**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1459**

JOSEPH LAROSA; DOMINICK LAROSA,

       Plaintiffs - Appellants,

    v.

VIRGIL D. LAROSA; SANDRA LAROSA,

       Defendants – Appellees,

    and

ANDREA PECORA, a/k/a Andrea Fucillo; JENNIFER LAROSA WARD;
CHRIS WARD; CHEYENNE SALES COMPANY, INCORPORATED,

       Defendants,

JOAN LAROSA, individually and as the Executrix of the Estate
of Virgil B. LaRosa,

       Party-in-Interest.

Appeal from the United States District Court for the Northern
District of West Virginia, at Clarksburg. Frederick P. Stamp,
Jr., Senior District Judge. (1:07-cv-00078-FPS-JSK)

Argued: May 13, 2014          Decided: June 11, 2014

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Gregory wrote the
opinion, in which Judge Niemeyer and Judge Floyd joined.

**ARGUED:** Paul A. Prados, DAY & JOHNS, PLLC, Fairfax, Virginia, for Appellants.  Matthew Pearsall Heiskell, SPILMAN THOMAS & BATTLE, PLLC, Morgantown, West Virginia, for Appellees.  **ON BRIEF:**  James Strother Crockett, Jr., SPILMAN THOMAS & BATTLE, PLLC, Charleston, West Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Before us is the latest in a series of appeals concerning an intrafamilial dispute stemming from an unpaid debt incurred more than thirty years ago. In this appeal, we consider whether transfers between corporations violate the West Virginia Uniform Fraudulent Transfer Act where the transferor corporation is owned entirely by the debtor. Finding that the transfers do not originate from and involve assets of the debtor, we affirm.

I.

In 1982, Joseph and Dominick LaRosa ("Creditors") loaned $800,000 to their cousin Virgil B. LaRosa and his wife Joan ("Debtors"). Virgil B. LaRosa was the sole shareholder of Cheyenne Sales Company, Incorporated ("Cheyenne") until his death in 2006, at which time Joan LaRosa became the sole owner of Cheyenne. In 2004, this Court settled, by unpublished opinion, disputes concerning a 1994 judgment against the Debtors. LaRosa v. LaRosa, 108 F. App'x 113 (4th Cir. 2004). Subsequently, the Creditors attempted to collect on the debt in West Virginia, where the Debtors owned real property. The Debtors then initiated a series of transactions using Cheyenne to funnel some of their assets toward Virgil D. LaRosa, the Debtors' son, and his wife Sandra ("Transferees"). These transactions included a transfer of Virgil B. LaRosa's personal

3

funds to Cheyenne and ultimately placed the Debtors' assets beyond the Creditors' reach.

Cheyenne also entered into a series of transactions with Regal Coal Company, Incorporated ("Regal"), which was owned entirely by Virgil D. LaRosa. From the 1980s until 2009, when it ceased operations, Cheyenne maintained a business relationship with Regal. Cheyenne's business involved, among other things, buying raw coal and processing it for sale. Processing involved some amount of preparation that may have required cleaning or washing the coal. Cheyenne occasionally charged a separate fee for washing, although it only did so for a relatively small proportion of all the coal it processed during its existence. Regal purchased coal from Cheyenne and would sell the coal to other customers. After Virgil B. LaRosa's death, these sales were largely a product of Virgil D. LaRosa's work as an employee for both corporations.[1] Rather than conducting sales transactions directly with the end users of the

---

[1] Although Joan LaRosa assumed presidency of Cheyenne after Virgil B. LaRosa's death, she deferred to Virgil D., who was Cheyenne's general manager, regarding Cheyenne's financial decisions. As general manager of Cheyenne, Virgil D. sold coal on Cheyenne's behalf and, as president of Regal, purchased coal for Regal. Virgil D. assessed coal quality and the prices Cheyenne paid for coal. Virgil D. would negotiate sales prices with his father, then with Joan after his father's death. Virgil D. "was probably doing the negotiating on behalf of both Regal and Cheyenne" for certain types of coal, and Joan never rejected his proposals. J.A. 2384-85.

4

coal, "Cheyenne allowed Regal to make sales to the ultimate customer rather than compete for that business because Virgil D. LaRosa, as he testified, was carrying out the wishes of Virgil B. LaRosa." J.A. 2380-84. According to Virgil D. LaRosa, Cheyenne's reputation was so poor that it could not enter into contracts with end users of the coal.

In 2007, Creditors filed suit alleging violations of the West Virginia Uniform Fraudulent Transfer Act ("WVUFTA"). The suit named Transferees as defendants, along with Cheyenne and other individuals not party to this appeal. After a bench trial, the district court found in Creditors' favor. The district court explained that "Cheyenne [was] operated as a conduit through which a portion of the debtor's wealth [was] passed on its way to defendants or others." The court separated the alleged transactions into three categories and found that all three categories involved intentionally fraudulent transfers designed to hinder, delay, and defraud the Creditors' efforts to collect on their judgment against the Debtors. The third category of transfers, the only one relevant to this appeal, implicated the business dealings between Cheyenne and Regal referenced above.[2] The district court assigned monetary values

_____

[2] The first two categories were (1) a transfer from Virgil B. LaRosa to Cheyenne within weeks of the Creditors executing the judgment against the Debtors, and (2) Cheyenne's purchase of
(Continued)

5

to the first two categories but not the third, and, as a result, awarded judgment only in the amount of the first two series of transactions.

On appeal, this Court remanded with respect to the Cheyenne-Regal transactions. <u>LaRosa v. LaRosa</u>, 482 F. App'x 750 (4th Cir. 2012). We held that the district court abused its discretion in finding a WVUFTA violation but failing to assign an award for the amount fraudulently transferred. <u>Id.</u> at 757. While there were findings demonstrating that Cheyenne and Regal operated as a single entity, we emphasized the district court's failure to "make a factual finding as to what was transferred away from the Debtors--a necessary precondition of the WVUFTA." <u>Id.</u> In remanding for further factfinding, we explained that

> <u>[a]ssuming that the district court maintains its view that the Cheyenne-Regal transactions violated the WVUFTA, the court will have to</u> resolve the significant factual dispute surrounding the amount fraudulently transferred through these transactions and <u>specify what asset of the Debtors was transferred in connection with the Cheyenne-Regal transactions that brought them within the purview of the WVUFTA.</u>

<u>Id.</u> at 758 (emphasis added).

On remand, the district court modified its earlier findings and held that the Cheyenne-Regal transactions did not involve a

---

annuities, the accounts of which benefited Virgil D. LaRosa and Regal, using funds from Cheyenne's line of credit that encumbered Debtors' securities.

transfer of Virgil B. LaRosa's property.  Creditors timely appealed.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

After a bench trial, we review findings of fact for clear error and conclusions of law de novo.[3]  See, e.g., Helton v. AT&T Inc., 709 F.3d 343, 350 (4th Cir. 2013).

Under the WVUFTA, a transfer is fraudulent if a debtor transfers property "without receiving a reasonably equivalent value in exchange."  W. Va. Code. Ann. § 40-1A-5(a).  A transfer is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance."  Id. § 40-1A-1(l).  An asset is the property of a debtor, except, inter alia, property encumbered by a valid lien.  Id. §§ 40-1A-1(b).  A transfer can only occur after the debtor acquires rights in the asset transferred.  Id. § 40-1A-6(d).

---

[3] Creditors contend that de novo review applies because whether an item is an asset within the WVUFTA is a legal conclusion.  Debtors argue for clear error review because the existence of a transfer is a factual question and the district court's latest opinion indicated that it was modifying its prior findings.  Resolution of this dispute is unnecessary, as the result is the same under either standard.

The issue before us turns on the following questions: (1) whether the transactions involved assets of Virgil B. LaRosa, the debtor, and (2) whether those assets were transferred as defined by statute, i.e., from Virgil B. LaRosa. The Creditors' stake their position on the notion that Cheyenne's profits and business opportunities are assets subject to the WVUFTA because they constitute the value of Cheyenne's stock, and Virgil B. LaRosa, having owned the entirety of Cheyenne stock, owned the right to receive Cheyenne's profits. Creditors further maintain that diversion of profits and opportunities, through managerial decisions that avoided potential increases in profits, amounted to Virgil B. LaRosa effectively transferring his property.

We find that the transfers neither involved the Debtors' assets nor originated from the Debtors. As we previously noted, "the WVUFTA does not prohibit the fraudulent transfer of assets from Cheyenne to Regal; it prohibits fraudulent transfers from the Debtors to others. . . . [T]here must nevertheless be a transfer from the shareholder to the corporation of some asset." LaRosa, 482 F. App'x at 757. The transfers now before us were not from shareholder to corporation; they originated from Cheyenne. To the extent those transfers involved property belonging to any entity, such property belonged to Cheyenne, not the Debtors. Corporations, not stockholders, hold legal title to corporate property. See City of Huntington v. Public Serv.

8

Comm'n, 110 S.E. 192, 198 (W. Va. 1921). Creditors contend that the assets were opportunities for profit that Cheyenne would have realized had it either sold coal directly to customers or charged Regal for certain processing tasks. Any opportunities for profit, which are arguably too speculative to constitute property, belonged to Cheyenne. Virgil B. LaRosa could not have personally acquired rights to those unrealized corporate opportunities. Any transfer of such assets were not his own and could not, under the WVUFTA, originate from him, even assuming he might benefit from an increase in Cheyenne's revenue.[4] Not having originated from a debtor and not having involved debtor assets, the Cheyenne-Regal transfers do not violate the WVUFTA.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[4] Virgil B. LaRosa pledged certain Cheyenne assets, including its accounts receivable, as collateral for a series of loans. Thus, it is uncertain to what extent he would have benefited from any increased profits. Perhaps more importantly, the collateralization of these loans would implicate the encumbrance exception and thereby prevent Cheyenne's accounts receivable from being assets under the WVUFTA.

9